IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF CALIFORNIA

BRYON SUMMERSVILLE,

    Petitioner,                        No. CIV S-08-2098 JAM CHS P

    vs.

D.K. SISTO, et al.,

    Respondent.           FINDINGS AND RECOMMENDATIONS

_____/

I. INTRODUCTION

Petitioner Bryon Summersville is a state prisoner proceeding pro se with a petition for writ of habeas corpus brought pursuant to 28 U.S.C. §§ 2254. Petitioner is currently serving a life sentence for a 1993 second degree murder conviction. Petitioner does not challenge the propriety of his conviction; rather, he challenges its execution, and specifically, the constitutionality of the January 3, 2007 decision of the Board of Parole Hearings ("Board") finding him unsuitable for parole.

II. FACTUAL AND PROCEDURAL BACKGROUND

On direct appeal, the California Court of Appeal, Fourth District, summarized the facts of petitioner's commitment offense as follows:

/////

1

> On December 8, 1992, [the victims] Alberto Fox and Timothy Burke drank beer and vodka kamikazes and smoked crack cocaine. They then went to the home of [petitioner's crime partners] Don Bailey and Dupree Allen, Burke's cocaine suppliers. Burke claimed that Bailey and Allen owed him money.
>
> ...Burke and Bailey conversed, then Burke yelled at Bailey about the money and said he had a weapon. Fox and Burke left. They went to a gas station where they drank more beer, then, with Fox driving, they proceeded to the apartment where they lived with Fox's sister.
>
> Fox parked across the street from the apartment. Within seconds, a car pulled up next to theirs, the doors flew open, and Bailey and Allen jumped out. Also in the car was petitioner. Bailey and Allen told Burke, who had apparently alighted from his car, that it was "time to get fucked-up."
>
> Petitioner alighted from Bailey and Allen's car, said "got something for you" or "it is your time," and jabbed at Fox through the open window of Burke's car. Petitioner lunged at Fox three or four times as Fox tried to start the car. At first Fox thought that petitioner was punching him, then he felt blood. Fox succeeded in starting the car, drove to the back of the apartment complex, left the car's engine running, and jumped out.
>
> Bleeding badly, Fox walked cautiously down a walkway. He saw Bailey and Allen's car pulling away. He saw Burke lying at the side of the street and called to him but received no response. Fox made it to his apartment and banged on the door. His sister answered. He told her to call 911 because he and Burke had been stabbed.
>
> When the police arrived, Burke was still alive, but he died shortly thereafter due to internal bleeding. He had suffered several stab wounds. Fox survived the attack but sustained multiple stab wounds to his armpit, elbow, and chest, including one that penetrated the lung.

(Ex. F[1] at 2.)

At the January 3, 2007 hearing, petitioner denied any intent to seek out the victims or other calculation on his part. (Ex. F at 20.) He stated that he thought he was getting a ride to his own apartment when Bailey said they were "going to check something out" and the car was

---

[1] Except where otherwise noted, all citations to exhibits refer to the exhibits attached to the pending petition.

2

driven to the scene of the crime. (*Id*. at 22-24.) Petitioner indicated that he jumped out of the car and stabbed Fox with a folding knife that he carried on his belt buckle when he saw Bailey and Allen get into a scuffle with victim Burke. (*Id*. at 25, 29.) At the time, petitioner believed that he was defending himself and helping his crime partners by stopping Fox from exiting the car. (*Id*. at 26.)

A jury found petitioner guilty of second degree murder of victim Burke under an aiding and abetting theory. An enhancement was imposed for personal use of a knife. Petitioner was also found guilty of assault with a deadly weapon on victim Fox with personal use of a knife and personal infliction of great bodily injury. On direct appeal, the personal knife use enhancements were stricken. Petitioner was sentenced to an aggregate term of 22 years to life.

Petitioner was received in state prison in December of 1993. His minimum eligible parole date passed on September 2, 2007. Several months prior to that date, on January 3, 2007, a panel of the Board of Parole Hearings conducted petitioner's initial parole suitability hearing and determined that he was unsuitable for parole. In finding petitioner to be unsuitable for parole, the panel cited the nature of his commitment offense, stating that it was particularly egregious because there was evidence of calculation and because multiple victims were involved. (Ex. F at 74.) The panel also relied on petitioner's most recent psychological report, which it characterized as negative. (*Id*. at 75.) The panel further found that petitioner's parole plans were inadequately developed.[2] (*Id*. at 76.)

Petitioner raised his claims arising from the Board's denial in a petition for writ of habeas corpus in the San Diego County Superior Court. The petition was denied. (Respondent's

---

[2] The commissioner who gave the panel's decision briefly noted that petitioner had received a total of six 128(a) counseling chronos during his incarceration. (Ex. F at 75.) It was not clear, however, whether the panel was relying on petitioner's institutional behavior as a factor for its decision. *See* 15 Cal. Code Regs. § 2281(c)(6) ("serious misconduct in prison or jail" is a factor tending to indicate unsuitability). Because the Board's decision was supported by some evidence with regard to at least one other unsuitability factor, petitioner's institutional behavior need not be addressed here.

Ex. 1.) Petitioner presented his claims to the California Court of Appeal, Fourth Appellate District, and the California Supreme Court, where they were likewise denied. (Respondent's Ex. 3 & 5.)

### III.  ISSUES PRESENTED

Petitioner contends that the Board's decision was arbitrary and unsupported by any reliable evidence in the record. Petitioner further contends that the parole unsuitability factors set forth in 15 Cal. Code Regs. § 2281 are void and unconstitutional. For the reasons that follow, the petition should be denied.

### IV.  APPLICABLE LAW FOR FEDERAL HABEAS CORPUS

An application for writ of habeas corpus by a person in custody under judgment of a state court can be granted only for violations of the Constitution or laws of the United States. 28 U.S.C. §2254(a); *see also Peltier v. Wright*, 15 F.3d 860, 861 (9th Cir. 1993); *Middleton v. Cupp*, 768 F.2d 1083, 1085 (9th Cir. 1985) (*citing Engle v. Isaac*, 456 U.S. 107, 119 (1982)). This petition for writ of habeas corpus was filed after the effective date of, and thus is subject to, the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"). *Lindh v. Murphy*, 521 U.S. 320, 326 (1997); *see also Weaver v. Thompson*, 197 F.3d 359 (9th Cir. 1999). Under AEDPA, federal habeas corpus relief also is not available for any claim decided on the merits in state court proceedings unless the state court's adjudication of the claim:

> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
>
> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d); *see also Penry v. Johnson*, 532 U.S. 782, 792-93 (2001); *Williams v. Taylor*, 529 U.S. 362, 402-03 (2000); *Lockhart v. Terhune*, 250 F.3d 1223, 1229 (9th Cir. 2001). This court looks to the last reasoned state court decision in determining whether the law applied to a particular claim by the state courts was contrary to the law set forth in the cases of the United

States Supreme Court or whether an unreasonable application of such law has occurred. *Avila v. Galaza*, 297 F.3d 911, 918 (9th Cir. 2002), *cert. dismissed*, 538 U.S. 919 (2003).

## V.  DISCUSSION

    A.    Petitioner's due process rights were not violated because the Board's decision is not arbitrary and is supported by some evidence.

The Due Process Clause of the Fourteenth Amendment prohibits state action that deprives a person of life, liberty, or property without due process of law.  A person alleging a due process violation must first demonstrate that he or she was deprived of a protected liberty or property interest, and then show that the procedures attendant upon the deprivation were not constitutionally sufficient. *Kentucky Dep't. of Corrections v. Thompson*, 490 U.S. 454, 459-60 (1989); *McQuillion v. Duncan*, 306 F.3d 895, 900 (9th Cir. 2002).

A protected liberty interest may arise from either the Due Process Clause itself or from state laws. *Board of Pardons v. Allen*, 482 U.S. 369, 373 (1987).  The United States Constitution does not, in and of itself, create a protected liberty interest in a parole date. *Jago v. Van Curen*, 454 U.S. 14, 17-21 (1981).  However, where a state's statutory parole scheme uses mandatory language, it "creates a presumption that parole release will be granted" when or unless certain designated findings are made, thereby giving rise to a constitutional liberty interest. *McQuillion*, 306 F.3d at 901 (*quoting Greenholtz v. Inmates of Nebraska Penal*, 442 U.S. 1, 12 (1979)).  The Ninth Circuit has conclusively determined that California state prisoners who have been sentenced to prison with the possibility of parole have a clearly established, constitutionally protected liberty interest in receipt of a parole release date. *Irons v. Carey*, 505 F.3d 846, 850-51 (9th Cir. 2007) (*citing Sass v. Cal. Bd. of Prison Terms*, 461 F.3d 1123, 1128 (9th Cir. 2006)); *Biggs v. Terhune*, 334 F.3d 910, 914 (9th Cir. 2003); *McQuillion*, 306 F.3d at 903; and *Allen*, 482 U.S. at 377-78 (*quoting Greenholtz*, 442 U.S. at 12)).

The full panoply of rights afforded a defendant in a criminal proceeding is not constitutionally mandated in the context of a parole proceeding. *See Pedro v. Or. Parole Bd.*,

825 F.2d 1396, 1398-99 (9th Cir. 1987).  The Supreme Court has held that a parole board's procedures are constitutionally adequate if the inmate is given an opportunity to be heard and a decision informing him of the reasons he did not qualify for parole.  *Greenholtz*, 442 U.S. at 16.  In addition, the Ninth Circuit has conclusively determined that Supreme Court law clearly establishes that some evidence must support a parole decision.  *Sass*, 461 F.3d at 1128-29; *McQuillion*, 306 F.3d at 904.

Under the some evidence standard, a decision cannot be "without support" or "arbitrary."  *McQuillion*, 306 F.3d at 904 (*citing Superintendent v. Hill*, 472 U.S. 445, 457 (1985)); *Biggs*, 334 F.3d at 915.  It must have some indicia of reliability.  *Id*.  The standard is "minimally stringent," and a decision must be upheld if there is any evidence in the record that could support the conclusion reached.  *Powell v. Gomez*, 33 F.3d at 40 (*citing Cato v. Rushen*, 824 F.2d 703, 705 (9th Cir. 1987)); *Toussaint v. McCarthy*, 801 F.2d 1080, 1105 (9th Cir. 1986).  Examination of the entire record is not required.  *Id*.  The Supreme Court has specifically directed reviewing courts not to assess the credibility of witnesses or re-weigh the evidence.  *Hill*, 472 U.S. at 455.  The only relevant question is whether there is *any* reliable evidence in the record that could support the decision reached.  *See Id*.; *Toussaint*, 801 F.2d at 1105.

In evaluating whether some evidence supported the Board's decision, the analysis "is framed by the statutes and regulations governing parole suitability determinations in the relevant state."  *Irons*, 505 F.3d at 851.  The court is bound by California's construction of its own laws in this regard.  *See Bradshaw v. Richey*, 546 U.S. 74, 76 (2005).  The court "must look to California law to determine the findings that are necessary to deem [a petitioner] unsuitable for parole, and then must review the record to determine whether the state court decision holding that these findings were supported by 'some evidence' [ ] constituted an unreasonable application of the 'some evidence' principle."  *Id*.

Title 15, Section 2281 of the California Code of Regulations sets forth various factors to be considered by the Board in its parole suitability findings for life prisoners.  The

regulation is designed to guide the Board's assessment of whether the inmate poses "an unreasonable risk of danger to society if released from prison," and thus whether he or she is suitable for parole. *In re Lawrence*, 44 Cal.4th 1181, 1214, 1202 (2008). The Board is directed to consider all relevant, reliable information available regarding

> the circumstances of the prisoner's social history; past and present mental state; past criminal history, including involvement in other criminal misconduct which is reliably documented; the base and other commitment offenses, including behavior before, during and after the crime; past and present attitude toward the crime; any conditions of treatment or control, including the use of special conditions under which the prisoner may safely be released to the community; and any other information which bears on the prisoner's suitability for release.

15 Cal. Code Regs. § 2281(b). The regulation also lists several specific circumstances which tend to show suitability or unsuitability for parole. 15 Cal. Code Regs. § 2281(c)-(d). The overriding concern is public safety and the focus is on the inmate's *current* dangerousness. *In re Lawrence*, 44 Cal. 4th at 1205. Thus, "the proper articulation of the standard of review is not whether some evidence supports the *reasons* the Board cites for denying parole, but whether some evidence indicates that a parolee's release *unreasonably endangers public safety*. See In re Lawrence*, 44 Cal.4th at 1254. In other words, there must be some rational nexus between the facts relied upon and the ultimate conclusion that the prisoner continues to be a threat to public safety. *Id*. at 1227.

Here, the Board determined that petitioner was unsuitable for parole, in part, because of the nature of his commitment offense. A prisoner's commitment offense tends to show unsuitability for parole where it was committed in an especially heinous, atrocious or cruel manner. 15 Cal. Code Regs. § 2281(c)(1). Two of the relevant factors to this circumstance which were found by the Board in this case are that multiple victims were attacked, injured or killed (15 Cal. Code Regs. § 2281(c)(1)(A)), and that the offense was carried out in a dispassionate and calculated manner (15 Cal. Code Regs. § 2281(c)(1)(B)).

/////

Although petitioner denies any premeditation or calculation on his part, his participation in the attack can certainly be characterized as dispassionate. Petitioner claims that he did not know either of the victims except through his crime partners, that he was not then aware of any dispute between the victims and his crime partners, and that he was the initial aggressor in the attack on Fox, who did nothing to provoke him. (Ex. F at 26-27, 32, 61.)

Moreover, the Board properly considered that multiple victims were attacked in the same incident, even though there is no evidence that petitioner personally attacked both victims. While the relevant regulation refers specifically to the conduct of the individual prisoner (calling on the Board to consider whether "*[t]he prisoner* committed the offense in an especially heinous, atrocious, or cruel manner" (emphasis added)), the relevant factor whether multiple victims were attacked, injured or killed appears to focus on the criminal act as a whole rather than one individual's actions. *See* 15 Cal. Code Regs. § 2281(c)(1)(A). In addition, the panel is specifically directed to consider "the number of victims of the crime for which the prisoner was sentenced..." 15 Cal. Code Regs. § 2280. At the same time, petitioner must be given individualized consideration of all specified criteria. *In re Rosenkrantz*, 29 Cal.4th 616, 677 (2002).

At least one district court has found that it is enough to support a finding that the crime was "especially heinous, atrocious, or cruel" that two victims were attacked by a habeas corpus petitioner and his crime partners. *See Jackson v. Horel*, No. 07-1334, slip. op. at 8 (N.D. Cal. March 31, 2009); *see also Biggs*, 334 F.3d at 912, 916 (where prisoner had refused to actually kill the victim but agreed to be involved in the ruse to murder him, was present during the murder, paid money to the co-conspirators, and returned with the killer in an attempt to better conceal the body, the Ninth Circuit noted that "[w]hile Biggs did not commit the murder himself, he was intertwined with the conspiracy from the very beginning"). Moreover, both Fox and Burke were victims of crimes for which petitioner was sentenced based on this incident. Where petitioner admits that he attacked Fox in an effort to help or assist his crime partners who were

attacking Burke, the Board's determination that petitioner's individual participation in the crime was especially heinous, atrocious, or cruel because more than one victim was attacked has support in the record.

Where the facts of a commitment offense are especially heinous or particularly egregious, the commitment offense can by itself be a sufficient basis for denying parole. *In re Rosenkrantz*, 29 Cal.4th 616, 682 (2002); s*ee also Biggs v. Terhune*, 334 F.3d 910, 913-16 (9th Cir. 2003); *Sass v. Cal. Bd. of Prison Terms*, 461 F.3d 1123, 1126 (9th Cir. 2006); *Irons v. Carey*, 505 F.3d 846, 852-53 (9th Cir. 2007).[3] After an inmate has "served the minimum number of years required by his sentence" (*Irons*, 505 F.3d at 853), however, extended reliance solely on unchanging factors, such as the circumstances of the offense and conduct prior to imprisonment, runs contrary to the rehabilitative goals espoused by the prison system and could result in a due process violation. *Biggs*, 334 F.3d at 917.

In this case, the 2001 hearing at issue was petitioner's initial parole consideration hearing and it was held prior to his minimum eligible parole date of September 2, 2007. In *Irons*, the Ninth Circuit noted that

> in all the cases in which we have held that a parole board's decision to deem a prisoner unsuitable for parole solely on the basis of his commitment offense comports with due process, the decision was made before the inmate had served the minimum number of years required by his sentence. Specifically, in *Biggs*, *Sass*, and here, the petitioners had not served the minimum number of years to which they had been sentenced at the time of the challenged parole denial by the Board. All we held in those cases and all we hold today, therefore, is that, given the particular circumstances of the offenses in these cases, due process was not violated when these prisoners were deemed unsuitable for parole prior to the expiration of their minimum terms.

---

[3] In another case, *Hayward v. Marshall* (512 F.3d 536, 546-47 (9th Cir. 2008), a panel of the Ninth Circuit determined that under the "unusual circumstances" of that case, the unchanging factor of the gravity of the petitioner's commitment offense did not, by itself, constitute some evidence supporting the governor's decision to reverse a parole grant on the basis that the petitioner would pose a continuing danger to society. However, on May 16, 2008, the Court of Appeals vacated the decision in order to rehear it en banc. *Hayward v. Marshall*, 527 F.3d 797 (9th Cir. 2008). Therefore, the panel decision in *Hayward* is no longer citable precedent.

> Furthermore, we note that in *Sass* and in the case before us there was substantial evidence in the record demonstrating rehabilitation. In both cases, the California Board of Prison Terms appeared to give little or no weight to this evidence in reaching its conclusion that Sass and Irons presently constituted a danger to society and thus were unsuitable for parole. We hope that the Board will come to recognize that in some cases, indefinite detention based solely on an inmate's commitment offense, regardless of the extent of rehabilitation, will at some point violate due process, given the liberty interest in parole that flows from the relevant California statutes.

*Irons*, 505 F.3d at 853-54 (internal citations omitted).

Like the petitioner in *Sass* (461 F.3d at 1125), the petitioner in the pending case was convicted of second degree murder. Petitioner's offenses are at least as heinous and cruel as the offenses committed by Sass, who caused the death of another person in a hit and run drunk driving accident and was convicted of second degree murder, gross vehicular manslaughter, hit and run death, causing injury while driving under the influence, and felony drunk driving. *See Id*. In this case, the record does not demonstrate that, at the time of the 2001 hearing, the Board had relied for an extended time solely on petitioner's commitment offense or other unchanging factors; rather, the 2001 hearing was petitioner's initial parole consideration hearing. A denial of parole based solely on the gravity of petitioner's commitment offense would not, on the facts of this case, violate petitioner's right to due process.

Nevertheless, the Board relied on additional factors and circumstances in finding petitioner to be unsuitable for parole. Specifically, the Board relied on findings set forth in petitioner's most recent psychological report, and on his parole plans, which it found to be inadequately developed.

Psychological factors tend to indicate unsuitability for parole where "[t]he prisoner has a lengthy history of severe mental problems related to the offense." 15 Cal. Code Regs. § 2281 (c)(5). In this case, petitioner has no history of mental problems. The preparer of his most recent psychological report wrote, for an assessment of his dangerousness, as follows:

/////

> Prior to his incarceration Mr. Summersville's risk factors or significant determinates for violence were minimal as a result of his development and maintenance of a stable personal family and work life. There was no history of serious criminality, mental health or substance abuse issues. Mr. Summersville appears to have been able to work as a supervisor in a manufacturing company from the time when he was 20 years old up until the time he was incarcerated. He had three children and close relationships with the mothers of these children. There was no history of criminality as a juvenile nor as an adult other than a minor vehicle code violation and he has no mental health issues, never complained of any mental health issue nor had he ever been diagnosed or treated for any. He also had no history of substance abuse issues. Subsequent to his incarceration he has had no serious disciplinary actions and those he did acquire he was able to explain in a rational and logical manner. Mr. Summersville has willingly and whole-heartedly involved himself in educational and vocational endeavors, which by his own admission had been stabilizing and growth factors in his maturation and social development. In addition to demonstrating an openness, a self-evaluative manner and the development of appropriate personal values, Mr. Sumersville appears to have a clear understanding and good insight into the causative factors that led up to his life crime. Finally, Mr. Summersville expressed what appears to this examiner to be [a] genuine sense of guilt, shame and remorse for his life crime. As a result of all these factors there is a high reasonable probability that Mr. Summersville's risk of dangerousness is significantly lower than that of the average inmate incarcerated here at CSP Solano and average for those individuals who have committed similar offenses and had successful paroles in the community. Again, Mr. Summersville has no mental health issues or psychopathology that would be related to his suitability for parole thus any considerations the board would make in regards to his suitability should be related solely to his ability to comply with the conditions of parole.

(Ex. F at 56-57.) The Board found this report to be of questionable value because the evaluator's risk assessment of petitioner's re-entry into free society did not compare him to the average citizen in the community, instead comparing him to other prisoners. The Board indicated that, based on this factor, it was choosing to view the report negatively.

The evaluator's assessment of petitioner's potential for dangerousness may indeed have been more meaningful if petitioner had been compared to average citizens in the community instead of current or former prisoners. The Board's characterization of the report as a negative factor, however, is not supported by the record. After giving an overwhelmingly positive

assessment and estimating petitioner's risk to the community to be lower than the average inmate and average compared to inmates who committed similar offenses and had successful paroles, the evaluator specifically opined that "any considerations the board would make in regards to his suitability should be related solely to his ability to comply with the conditions of parole." (Ex. F at 57.) The evaluator's failure to assess petitioner in a specific manner which was not required nor requested does not bear on petitioner's suitability for release, and the Board's conclusion that petitioner was unsuitable for parole based on the content of his psychological report is unsupported by any reliable evidence in the record.

As set forth above, there was one final factor relied upon by the Board in finding petitioner unsuitable for parole. A prisoner's understanding and plans for the future are factors tending to indicate suitability for parole where the prisoner has made realistic plans for release or has developed marketable skills that can be put to use upon release. 15 Cal. Code Regs. § 2281(c)(8). At the hearing, petitioner stated that if paroled, he planned to reside with his sister in her home. (Ex. F at 37.) He also planned to find employment within his sister's childcare and development business. (*Id*. at 37.) Petitioner had no letters of support, however, from his sister or anyone else, confirming his plans. (*Id*. at 37-38.)

A prisoner's understanding and plans for the future are, notably, a parole *suitability* factor, as opposed to being an unsuitability factor where there are no such plans. The Board, however, is entitled to consider any information which bears on petitioner's suitability for release. 15 Cal. Code Regs. § 2281(b). A complete lack of evidence that petitioner has a place to live, employment opportunities, or any support whatsoever, including emotional support, from friends or family if released bears negatively on a determination of his suitability. Petitioner's lack of concrete plans for parole was appropriately considered by the Board and it's conclusion that he presents a risk of danger to society if released because he has no demonstrated plans for the future has support in the record.

/////

Due process requires that the Board's decision be supported by some evidence in the record and that modicum is present in this case. Based on the foregoing, there is some support for the Board's conclusion that petitioner would pose a risk of danger to the public if released, based on the nature of his commitment offense considered in conjunction with his inadequately developed plans for parole. The Board's decision meets the minimally stringent test set forth by the Ninth Circuit in *Biggs*, *Sass*, and *Irons*. The decision of the California courts upholding the Board's denial of parole is not contrary to, or an unreasonable application of any clearly established federal due process law. Accordingly, petitioner is not entitled to relief on his claim that the Board's failure to find him suitable for parole at the January 3, 2007 parole suitability hearing violated his right to due process.

      B.      The parole unsuitability factors set forth in 15 Cal. Code Regs. § 2281 are not void or unconstitutional.

Petitioner claims that the Board has impermissibly used the parole unsuitability factors set forth in the California Code of Regulations to enlarge the scope of its authority granted under California Penal Code, section 3041. The California Court of Appeal found this claim to be without merit, noting that the "regulations are derived from decades of decisional law." (Respondent's Ex. 3 at 5 (citing *In re Seabock*, 140 Cal. App.3d 29, 33-38 (1st Dist. 1983)).

Petitioner cites no authority for this claim. He has failed to show that the decision of the California Court of Appeal is contrary to, or an unreasonable application of any clearly established federal law. *See Garlotte v. Fordice*, 515 U.S. 39, 46 (1995) (a petitioner bears the burden on federal habeas corpus review to show that constitutional error occurred). No relief can be granted.

### V. CONCLUSION

For the foregoing reasons, IT IS HEREBY RECOMMENDED that petitioner's application for a writ of habeas corpus be DENIED.

       These findings and recommendations are submitted to the United States District Judge assigned to the case, pursuant to the provisions of 28 U.S.C. § 636(b)(l). Within twenty days after being served with these findings and recommendations, any party may file written objections with the court and serve a copy on all parties. Such a document should be captioned "Objections to Magistrate Judge's Findings and Recommendations." Any reply to the objections shall be served and filed within ten days after service of the objections. The parties are advised that failure to file objections within the specified time may waive the right to appeal the District Court's order. *Martinez v. Ylst*, 951 F.2d 1153 (9th Cir. 1991).

DATED: October 21, 2009

                                      CHARLENE H. SORRENTINO
                                      UNITED STATES MAGISTRATE JUDGE